**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMANDA JANE BERGQUIST, | |
| Plaintiff, | Case No. 18-cv-3619 |
| v. | |
| DONALD MILAZZO, *et al.* | Judge John Robert Blakey |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Amanda Bergquist, a self-described "First Amendment auditor," went to the Bridgeview Courthouse in March 2018 to address three traffic tickets. At the security checkpoint, court security officers told her she could not bring the video camera she carried into the courthouse. Plaintiff subsequently began filming the exterior of the courthouse, scanning up and down with her camera. When officers noticed, they confronted her, asked for her identification, and attempted to ascertain her intentions for filming. Plaintiff refused to identify herself, remained uncooperative, and continued to record both the exterior and interior of the courthouse. The officers then detained her inside the courthouse, searched through her purse, wallet, and camera, and brought her before the presiding judge who ordered her to cease her recording.

Based upon these events, Plaintiff has sued four of the officers involved that day—Donald Milazzo, Jennifer Larson, Kenneth Dorociak, and Kelly Jackson—and

1

the Cook County Sheriff's Office and Sheriff Thomas Dart under 42 U.S.C. § 1983, alleging First and Fourth Amendment injuries. The parties now cross-move for summary judgment. [107]; [112]. For the reasons explained below, this Court grants Defendants' motion for summary judgment [112] and denies Plaintiff's motion for summary judgment [107].

## I. Background

This Court takes the following facts from Plaintiff's Statement of Facts [108], Defendants' Statement of Facts [114], Plaintiff's Responses to Defendants' Statement of Facts [122], Defendants' Responses to Plaintiff's Statement of Facts [124], and Defendants' Statement of Additional Facts [125]. Because Plaintiff failed to respond to Defendants' Statement of Additional Facts [125], this Court deems those facts admitted. *See Tabiti v. LVNV Funding, LLC*, No. 13-CV-7198, 2019 WL 1382235, at *2 (N.D. Ill. Mar. 27, 2019).

### A. The Parties

Plaintiff was a citizen of Illinois at the time of the relevant events. [114] at ¶ 1; [122] at ¶ 1. Plaintiff describes herself as a "First Amendment auditor," meaning she "test[s] people on the First Amendment," specifically "people who are in law enforcement, government employees." [107-2] at 49–50. Plaintiff maintains a YouTube page devoted to her First Amendment auditing activities and posts videos of her activities; she estimates that she has made 300 to 400 videos depicting "First Amendment auditing" and "cop watching." *Id.* at 51, 59.

2

At all times relevant, Defendant Donald Milazzo worked as a lieutenant officer with the Cook County Sheriff's Office, [114] at ¶ 2; [122] at ¶ 2; Defendant Larson worked as a sergeant officer with the Cook County Sheriff's Office, [114] at ¶ 3; [122] at ¶ 3; Defendant Kenneth Dorociak worked as an officer with the Cook County Sheriff's Office, [114] at ¶ 4; [122] at ¶ 4; Defendant Kelly Jackson acted as a chief officer with the Cook County Sheriff's Office, [114] at ¶ 5; and Defendant Thomas Dart was (and remains) Sheriff of Cook County, [122] at ¶ 6. Defendant Cook County is a body politic and corporate under Illinois law. [114] at ¶ 5.

### B. Plaintiff's Initial Encounter with Officer Barbaro

The Bridgeview Courthouse in Bridgeview, Illinois handles a variety of cases including traffic court, domestic violence, and felony matters. [125] at ¶ 1. Victims, witnesses, and jurors all use the front entrance. *Id.*; [107-12] at 47–48.

On March 28, 2018, Plaintiff went to the Bridgeview Courthouse to address three traffic tickets. [108] at ¶ 1. She carried a Sony handheld camera in her purse. *Id.* at ¶ 2. At the security checkpoint of the courthouse, a Sheriff's deputy denied her entry because she possessed a handheld video camera; she was also advised to call the Sheriff's Department to inquire whether it could hold her camera while she was in court. [114] at ¶ 2; [124] at ¶ 3. Plaintiff stepped outside to call the Sheriff's Department; according to Plaintiff, the Sheriff's Department refused to hold her camera. [108] at ¶ 4; [124] at ¶ 4.

Plaintiff then stood outside the front entrance of the Bridgeview Courthouse and began filming. [114] at ¶ 3. Plaintiff asserts that she was recording her reflection

3

in the mirrored windows surrounding the building and the no-smoking sign, [108] at ¶ 6, while Defendant maintains that Plaintiff's recording captured activity both inside and outside the courthouse, including various people entering and exiting the courthouse, the entrance way, security features including the positioning of security personnel, locations of metal detectors, surveillance cameras, emergency exits, panic buttons, call boxes, and vehicular barriers, [124] at ¶ 6.

Officer Barbaro, a sheriff's deputy working security that day, testified at his deposition that he saw a "woman outside the building videotaping the building, scanning back and forth with the camera up and down, people coming in and out possibly, possibly videotaping through the glass at the security post that I work at of the entry procedure." [114-5] at 3. Officer Barbaro came out, stood at the front entrance with the door propped open by his body, and asked Plaintiff what she was doing, to which Plaintiff responded that she was recording the building because she wanted to record it. [108] at ¶¶ 7–8; [114] at ¶ 10. Officer Barbaro also asked Plaintiff why she was recording ("for what purpose?"), and Plaintiff ignored him. [114] at ¶ 10; [114-2] (Bergquist's video). Plaintiff's video shows the interior of the courthouse entrance. [114-2].

According to Defendant Dorociak, who worked security that morning, someone standing at Plaintiff's distance to the courthouse would be able to see inside and videotape inside the building. [107-12] at 50. Dorociak additionally testified that, on the other side of the window from where Plaintiff was standing, "the front door security is laid out," including security equipment and the x-ray machine. *Id.* at 51.

4

### C.    Plaintiff's Encounter with Milazzo

Barbaro radioed for additional security and requested a supervisor response. [114] at ¶ 11; [114-2].  Defendant Milazzo then responded almost immediately by coming to the scene, and at the door of the building, Officer Barbaro said to Milazzo that "the woman is taping the building, I asked her why, and she said because she wants to."  [114-2].  At his deposition, Milazzo testified that "at the time we didn't know if she was videotaping people coming out, videotaping witnesses, videotaping people that were involved in domestic violence, videotaping people inside the door where the [security] posts were."  [107-5] at 14.  Milazzo found it suspicious that "she was videotaping the building and possibly inside the doors."  *Id.* at 27–28.

Milazzo approached Plaintiff and told her that there exists a judicial order "that says you cannot tape this building."  [114-2]; [108] at ¶¶ 9–10.  Plaintiff then asked Milazzo if she could see that judicial order, and Milazzo said "yeah, come on in, and we're gonna check your IDs, too."  [114-2]; [108] at ¶ 11.  When Plaintiff responded, "oh, I'm not going in," Milazzo said, "no, no, no, we're gonna run you, too. We're gonna get your name, we're gonna do a report."  [114-2] at 2.

Plaintiff refused ("um, no"), after which Milazzo informed her that he was detaining her and that she was "doing something suspicious."  *Id.*  Milazzo asked her to "come in" again, and Plaintiff responded, "I'm just gonna stay right here and continue recording."  [114-2].  Milazzo repeated, "you're gonna come in, and we're gonna find out who you are and what you're doing here."  *Id.*  Plaintiff responded, "no, you're not."  *Id.*

5

At that point, Milazzo turned to the front door of the courthouse and asked, "who's got cuffs? She does not want to go agreeably," and Officers Larson and Dorociak appeared. *Id.* As clearly shown in Plaintiff's video footage, her recording again captured the interior of the courthouse's entrance as Larson and Dorociak exit the building toward her and Milazzo. Plaintiff then asked, "I'm being detained for just taking pictures of the building?" *Id.* Milazzo replied, "you're doing something suspicious and we need to know who you are and why you're doing it, ok?" *Id.*

Plaintiff then asked Milazzo if he was "familiar with the First Amendment"; in response, Milazzo grabbed Plaintiff's camera and ordered officers to handcuff and bring her into the courthouse. [114-2]; [108] at ¶¶ 18–19. Plaintiff's camera continued to record. [114-2].

### D.     The Officers Escort Plaintiff into the Courthouse

After being escorted inside, Defendants Milazzo and Larson made multiple requests for Plaintiff to identify herself, and both informed her she could go if she identified herself. [108] at ¶ 20; [124] at ¶ 20; *see also* [114-11] (Larson's bodycam video). Milazzo also stated he would detain Plaintiff until "he decided who she was." [108] at ¶ 21; [114-2].

Plaintiff expressed her desire to remain silent and requested her lawyer. *Id.* at ¶ 22. She also refused to consent to the search or seizure of her camera and asked Milazzo if he had heard of the Fourth Amendment. *Id.* at ¶ 23. Milazzo responded "oh great, why do we always get the crazies." *Id.* at ¶ 24. After this statement, the video footage from Plaintiff's video ends. *Id.* at ¶ 25.

Milazzo testified that, while Plaintiff remained detained, he contacted his supervisor, Defendant Jackson, who instructed him to contact the presiding judge's office for further instruction regarding Plaintiff. [114] at ¶ 24. According to Milazzo, he called the presiding judge's office, and an assistant told him to bring Plaintiff to Judge Peter Felice. *Id.* at ¶ 25.

At some point during Plaintiff's detention, Milazzo emptied the contents of Plaintiff's purse on a counter and searched her wallet until he found her identification. [108] at ¶ 27. Milazzo also searched through the contents of Plaintiff's camera. *Id.* at ¶ 28.

The parties dispute exactly how long Plaintiff remained detained: Plaintiff states she was in the deputy's office for an hour and a half while handcuffed, [108] at ¶ 29; Defendants dispute this statement but do not offer their own estimated length of detention, [124] at ¶ 29.

### E. Plaintiff's Court Appearance

Defendants Dorociak and Larson then escorted Plaintiff, in handcuffs, to Judge Peter Felice. [114] at ¶¶ 27–28. In court, Judge Felice asked Milazzo about Plaintiff:

> THE COURT: What was observed[,…] this woman was doing?
>
> THE LIEUTENANT [MILAZZO]: She was observed videotaping in front of the building, and when the doors would open trying to videotape inside the doors. When we asked her what she was doing and why, she refused to identify herself, refused to explain what she was doing. Wouldn't tell us anything until we took her in to detain to find out who she was.

[107-7] at 3. Judge Felice then questioned Plaintiff directly:

> THE COURT: Can you tell this court for what reason are you videotaping this facility and people walking in and out?
>
> MS. BERGQUIST: That's not true. I wasn't –
>
> THE COURT: Well, there is [sic] people walking in and out the front door; am I correct?
>
> MS. BERGQUIST: Well, what happened, I have business here. I have court at 1:30 for some traffic stuff. So I was getting ready to leave out, go outside, killing some time. And there's a reflection. I wasn't recording the door. I was outside the whole time recording the reflective glass. I was recording my own reflection.
>
> THE COURT: Why?
>
> MS. BERGQUIST: Just because. I record, and it is a hobby.

*Id.* at 3–4.

Judge Felice then informed Plaintiff "there is a standing court order that no photography is to take place inside the courtroom, and that is going to include the entrance and the exits." *Id.* at 4. He also instructed Plaintiff to "not record this building, people coming in and out, or anybody in the parking lot." *Id.* at 6. Judge Felice then provided Plaintiff the option to surrender her camera's SD card for his staff to erase, or alternatively, to surrender the SD card completely. *Id.* at 5. Plaintiff chose the former option, and Judge Felice informed her she could retrieve her erased SD card later. *Id.* at 7. After she received her SD card back from the court, Plaintiff had it restored by a specialist. [108] at ¶ 36.

### F. Plaintiff's Claims and Procedural History

Plaintiff sued, alleging in her operative, second amended complaint, ten claims: in Counts I and II, she alleged that all of the Defendants engaged in First

8

Amendment retaliation in violation of 42 U.S.C. § 1983 by handcuffing, detaining, and arresting her for exercising her right to record a public building, [34] ¶¶ 93–111; in Counts III and IV she claimed, respectively, that all Defendants violated the Fourth Amendment by detaining and arresting her, and that all Defendants but Jackson violated the Fourth Amendment by seizing her camera, *id.* ¶¶ 112–138; in Counts V, VI, and VII Plaintiff alleged that Defendants Milazzo, Dart, the Cook County Sheriff's Office, and Cook County violated the Fourth Amendment by searching her camera (Count V), seizing its footage (Count VI), and searching her purse (Count VII), *id.* ¶¶ 139–170; in Count VIII, she alleged a constitutional abuse of process claim against all Defendants, *id.* ¶¶ 171–178; and in Counts IX and X she alleged that Defendants Dart, the Cook County Sheriff's Office, and Cook County are municipally liable under § 1983 for maintaining a policy of arresting people for taking pictures of public buildings, or alternatively, for their failure to supervise and train police officers on the proper way to conduct investigations of a criminal suspect, *id.* ¶¶ 179–197.

In February 2020, this Court dismissed Count VIII, Plaintiff's abuse of process claim, in its entirety; dismissed Dart to the extent Plaintiff alleged individual liability against him; dismissed Dart and the Cook County Sheriff's Office from Counts I through VII; and dismissed all substantive claims against Cook County (but allowing the County to remain a necessary party solely for indemnification purposes) [90].

The parties have now cross-moved for summary judgment on Plaintiff's remaining claims against the remaining Defendants. [107]; [112].

## II.    Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). The non-moving party bears the burden of identifying the evidence creating an issue of fact. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021–22 (7th Cir. 2018). To satisfy this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of Centralia*, 943 F.3d 826, 832 (7th Cir. 2019). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## III.    Analysis

The parties cross-move for summary judgment on all of Plaintiff's remaining claims against the remaining Defendants.  [107]; [112].  This Court addresses each category of claims below.

### A.    Fourth Amendment Claims

Defendants move for summary judgment on Plaintiff's Fourth Amendment claims, arguing that the record fails to raise a triable issue of fact as to the reasonableness of their initial *Terry* stop and subsequent search of Plaintiff's purse and camera.  [113] at 7–12.  Plaintiff cross moves for summary judgment on her Fourth Amendment claims, countering that Defendants lacked reasonable suspicion to conduct the *Terry* stop, that the *Terry* stop ripened into an arrest unsupported by probable cause, and that Milazzo conducted an unconstitutional search of her belongings.  [107] at 17–23.

### 1.    Fourth Amendment Seizure

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  In general, under this amendment, a "warrantless arrest, like a warrantless search, must be supported by probable cause."  *United States v. Navarro*, 90 F.3d 1245, 1254 (7th Cir. 1996); *see also United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020).  Although generally seizures are only reasonable when based upon probable cause, pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), an officer may, consistent with the Fourth Amendment, conduct a brief,

11

investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot, *Eymann*, 962 F.3d at 282.

Reasonable suspicion requires "more than curiosity, inchoate suspicion, or a hunch." *United States v. Cole*, 994 F.3d 844, 849 (7th Cir. 2021), *reh'g en banc granted*, *opinion vacated*, No. 20-2105, 2021 WL 2363773 (7th Cir. June 9, 2021). When observed by trained law enforcement officers, however, "objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." *United States v. Cortez*, 449 U.S. 411, 419 (1981). Moreover, because this Court evaluates reasonable suspicion in light of the totality of the circumstances, certain behavior "may give rise to reasonable suspicion when viewed in the context of other factors at play." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). Ultimately, determining whether "reasonable suspicion exists is not an exact science, and 'must be based on commonsense judgments and inferences about human behavior.'" *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). In evaluating whether reasonable suspicion exists, the "subjective beliefs or intentions of law enforcement officers are irrelevant"; instead, courts ask whether the facts available to an officer at the time of the seizure "would warrant a person of reasonable caution in the belief that the action taken was appropriate." *United States v. Wanjiku*, 919 F.3d 472, 487 (7th Cir. 2019); *see also Whren v. United States*, 517 U.S. 806, 813 (1996) (noting that the Court has

"been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers").

A *Terry* stop, however, cannot continue indefinitely, *United States v. Reedy*, 989 F.3d 548, 552 (7th Cir. 2021), and thus "can ripen into a *de facto* arrest that must be based on probable cause if it continues too long or becomes unreasonably intrusive," *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011). But the law places no rigid time limits upon *Terry* stops; and an individual's "actions can contribute to a permissible extension of the stop." *United States v. Ruiz*, 785 F.3d 1134, 1143 (7th Cir. 2015); *see also United States v. Lopez*, 907 F.3d 472, 486 (7th Cir. 2018) ("The question does not depend on exactly how many minutes the stop lasts. It depends on whether law enforcement has detained the person longer than needed to carry out the investigation that was justified by the reasonable suspicion."). Using "handcuffs, placing suspects in police cars, drawing weapons, and other measures of force more traditionally associated with arrests may be proper during an investigatory detention, depending on the circumstances." *Bullock*, 632 F.3d at 1016; *see also United States v. Tilmon*, 19 F.3d 1221, 1224–25 (7th Cir. 1994) (court noted that the "trend has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention.").

If the stop does ripen into an arrest requiring probable cause, the arrest remains lawful if the officers possess probable cause. Probable cause exists when the "totality of the circumstances" available to the team of officers "warrant a person of

reasonable causation" in the belief that a suspect has committed an offense, that is, the "kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 231 (1983). *See also United States v. Hammond*, 996 F.3d 374, 391 (7th Cir. 2021) (Probable cause exists "when the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect has committed an offense.") (quoting *United States v. Haldorson*, 941 F.3d 284, 290–91 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 1235 (2020)). An "arresting officer's state of mind (except for the facts that he knows) remains irrelevant to the existence of probable cause." *Reedy*, 989 F.3d at 554 (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).

### 2. Plaintiff's Initial Stop

This Court proceeds chronologically, starting with the initial stop of Plaintiff as she filmed the courthouse from the outside. On this issue, Plaintiff argues that Barbaro's initial stop of her violated her Fourth Amendment right to be free from detention absent reasonable suspicion, [121] at 4, while Defendants argue that Barbaro possessed reasonable suspicion to conduct a *Terry* stop, [113] at 9.

Given the factual record, Defendants' theory prevails. Clearly, "videotaping other people, when accompanied by other suspicious circumstances, may constitute disorderly conduct" under an Illinois statute stating that a person "commits disorderly conduct' when they knowingly do "any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." *Reher v. Vivo*,

656 F.3d 772, 775 (7th Cir. 2011) (quoting 720 ILCS 5/26–1(a)(1)). In this case, Officer Barbaro testified that he observed Plaintiff "scanning back and forth with the camera up and down, people coming in and out possibly, possibly videotaping through the glass at the security post that I work at of the entry procedure." [114-5] at 3. According to Officer Barbaro, the courthouse installed cameras outside the building after the 9/11 attacks to "watch the intakes for the air system in case someone wants to do something with that." [114-5] at 3. Given such circumstances, Officer Barbaro had reasonable suspicion to believe that Plaintiff violated or was violating a general administrative order of the court,[1] and/or the Illinois statute prohibiting disorderly conduct. He saw Plaintiff filming the entrance of the courthouse, a place where jurors, victims, witnesses, and litigants appear, and where security measures remain in place for the protection of all who come within the courthouse, including jurors, victims, witnesses, litigants, attorneys, courthouse security officers, and judges.

This Court also finds Officer Barbaro's decision to radio for a supervisor, and Officer Milazzo's subsequent investigatory stop of Plaintiff outside of the courthouse, reasonable under the circumstances. Officer Barbaro came out and asked Plaintiff what she was doing, to which Plaintiff responded that she was recording the building because she simply wanted to record it. [108] at ¶¶ 7–8; [114] at ¶ 10. Plaintiff ignored Officer Barbaro's question about the purpose of her recording. [114] at ¶ 10.

---

[1]Relevant here, a general order applicable to Cook County courthouses—an order that was in place in March 2018—provides: Except as noted below, all mobile computing and telecommunication devices including, but not limited to, cellular telephones, smart phones, laptop and tablet computers, and other electronic devices capable of connecting to the Internet or making audio or video recordings are prohibited in the Circuit Court of Cook County, Illinois. General Administrative Order No. 2013-01 (Circuit Ct. of Cook County).

Any reasonable officer would become concerned about Plaintiff's intentions for recording and would continue to investigate and call for back-up. As the Seventh Circuit recognized in *Braun v. Baldwin*, courthouses are "potentially dangerous places because of the presence of criminal defendants, bitterly divorcing spouses and custody-contesting ex-spouses, and other highly stressed, emotionally excited, and even violence-prone litigants," and thus, police and guards "are entitled to exercise a degree of control that would be oppressive in a different setting." 346 F.3d 761, 765 (7th Cir. 2003); *see also, e.g.*, *Newell v. County of San Diego*, No. 3:12-CV-1696-GPC-BLM, 2014 WL 2212136, at *6 (S.D. Cal. May 28, 2014) (holding that a "reasonable officer in charge of courthouse security, who had just observed an individual taking photographs of one or more courthouse-employee and/or law-enforcement vehicles parked in the private portion of the courthouse parking lot, would—at a minimum—contact the individual to ascertain his or her intentions"); *Legal Aid Soc'y of Orange Cty. v. Crosson*, 784 F. Supp. 1127, 1131 (S.D.N.Y. 1992) (noting that the "governmental interest in safeguarding courthouses is paramount").

In *Cady v. Sheahan*, the Seventh Circuit held that an officer was entitled to conduct a *Terry* stop of an individual who is "lurking amongst the bushes outside a courthouse two hours before it opens, is shabbily dressed, carrying a briefcase, claims to be a federal process server, refuses to provide identification upon request, and is evasive in response to police questioning." 467 F.3d 1057, 1062 (7th Cir. 2006). As the court reasoned, "a reasonably prudent officer would be concerned for the safety of the officers and civilians in the area, as well as for" the stopped individual. *Id.* Here,

as in *Cady*, a reasonably prudent officer in Officer Barbaro's position would be concerned about the well-being of officers, jurors, witnesses, victims, and judicial employees after seeing Plaintiff videotaping the courthouse and refusing to answer basic questions (especially where, as here, reasonable cause existed to believe Plaintiff captured footage of the court entrance and the inside of the courthouse, including the security post itself).

Plaintiff counters that she was filming only her own reflection off the outside of the building. [108] ¶ 6. But a reasonable courthouse security officer would have no way of knowing that at the time. *See United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005) ("[B]ehavior which is susceptible to an innocent explanation when isolated from its context may still give rise to reasonable suspicion when considered in light of all of the factors at play."). Dorociak testified that someone standing at Plaintiff's distance to the courthouse can see inside and videotape inside the building where the security equipment and the x-ray machine stood. [107-12] at 50, 51. Barbaro similarly testified that he thought Plaintiff was "possibly videotaping through the glass at the security post that I work at of the entry procedure." [114-5] at 3. And, the video footage itself confirms that Plaintiff *did*, in fact, record both the exterior *and* interior of the courthouse. Given the heightened security concerns surrounding courthouses, a reasonable officer in his position would, at a minimum, stop Plaintiff to investigate further.

### 3.  Extension of Initial Stop

The parties also disagree whether Barbaro's radioing of Milazzo and then Milazzo's subsequent questioning and detention of Plaintiff outside and inside the courthouse amounted to an unconstitutional Fourth Amendment seizure.  On this issue, Plaintiff contends that, once Milazzo handcuffed and led her into the courthouse, that action escalated the initial *Terry* stop into a de facto arrest which, she argues, was unsupported by probable cause.  [107] at 19–20.

Defendants, on the other hand, maintain that Plaintiff's continued detention remained within the scope of a permissible *Terry* stop and did not ripen into an arrest. [113] at 8–10.  This view finds support in the record because Plaintiff's evasiveness and refusal to identify herself prolonged the initial stop.  The Supreme Court has explained that obtaining "a suspect's name in the course of a *Terry* stop serves important government interests," and knowledge of identity may inform an officer that a suspect is "wanted for another offense or has a record of violence or mental disorder" or "may help clear a suspect and allow the police to concentrate their efforts elsewhere." *Hiibel v. Sixth Jud. Dist. Ct. of Nev.*, 542 U.S. 177, 186, (2004); *see also, e.g.*, *Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002) (holding that an hour-long investigatory detention, after placing the plaintiff in handcuffs at gunpoint, was reasonable to investigate whether he was the subject of a 9-1-1 call, because the "whole point of an investigatory stop, as the name suggests, is to allow police to *investigate,* in this case to make sure that they have the right person").

While relevant facts remain in dispute regarding the scope of the detention,[2] such factual questions remain irrelevant here because, even if the initial stop ripened into an arrest, the officers possessed probable cause. *See, e.g.*, *Reedy*, 989 F.3d at 554 (explaining that the same events supporting officers' reasonable suspicion to conduct a *Terry* stop also supported their probable cause to arrest). Based upon the record, a reasonable officer had probable cause to believe that Plaintiff violated the general administrative order prohibiting filming inside the courthouse, as well as the Illinois statute prohibiting disorderly conduct. Moreover, by the time Milazzo ordered the other officers to handcuff Plaintiff, the officer's initial observations combined with Plaintiff's evasive answers to routine questions about her identity and intentions. *See Devenpeck*, 543 U.S. at 149 (noting that "untruthful and evasive" answers can support probable cause); *see also Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1953 (2018). Given the totality of the facts available to the officers who viewed Plaintiff's behavior, as well as her own evasiveness and lack of cooperation, "a reasonably prudent person" in the officers' position would "think that [Plaintiff] had committed or was committing a crime." *United States v. Hill*, 818 F.3d 289, 295 (7th Cir. 2016); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Accordingly, this Court finds that reasonable suspicion justified Plaintiff's initial stop and that probable cause supported her later arrest.

---

[2] As noted above, the parties dispute, among other things, the length of Plaintiff's detention. [108] at ¶ 29; [124] at ¶ 29.

### 4.  Qualified Immunity as to the Seizure

Even if Plaintiff could raise a triable issue of fact as to whether the officers possessed reasonable suspicion to conduct the *Terry* stop, or alternatively, probable cause to continue to detain her, the doctrine of qualified immunity would also doom her Fourth Amendment seizure claims.

The doctrine of qualified immunity "balances dueling interests—allowing officials to perform their duties reasonably without fear of liability on the one hand and 'affording members of the public the ability to vindicate constitutional violations by government officials who abuse their offices' on the other." *Lopez v. Sheriff of Cook Cty.*, 993 F.3d 981, 987 (7th Cir. 2021) (quoting *Weinmann v. McClone*, 787 F.3d 444, 447–48 (7th Cir. 2015)).  In determining whether qualified immunity applies, courts ask: (1) whether an official's conduct violated a constitutional right; and if so, (2) whether that right was clearly established at the time of the alleged violation.  *Id.*  A right is "clearly established if it is sufficiently clear that any reasonable official would understand that his or her actions violate that right, meaning that existing precedent must have placed the statutory or constitutional question beyond debate." *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2017) (quoting *Zimmerman v. Doran*, 807 F.3d 178, 182 (7th Cir. 2015)).  Plaintiff bears the burden of establishing that the constitutional right was clearly established.  *Doe v. Village of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015).

The qualified immunity doctrine affords government officials "breathing room" to make "reasonable but mistaken judgments" by protecting "all but the plainly

incompetent or those who knowingly violate the law." *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). In the Fourth Amendment context, qualified immunity exists "in a false arrest case where there is 'arguable' probable cause" and "likely exists in a false *Terry* stop case where there is 'arguable' reasonable suspicion." *Rouei v. Village of Skokie*, 61 F. Supp. 3d 765, 778 (N.D. Ill. 2014) (quoting *Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014)). Courts maintain discretion to decide which of the two prongs of the qualified immunity analysis to engage in first. *Ashcroft*, 563 U.S. at 735; *see also Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (noting that the "latter inquiry is often dispositive and may be addressed first").

This Court concludes that qualified immunity forecloses Plaintiff's unconstitutional seizure claims. In this case, the relevant questions are whether Plaintiff demonstrated that, in light of precedent existing as of March 2018, Defendants were "plainly incompetent" or "knowingly violated the law" when, (1) after they viewed Plaintiff recording the exterior and interior of a courthouse, engaged in a *Terry* stop to ascertain her identity and intentions; and (2) arrested Plaintiff after she refused to identify herself and continued to record both the exterior and interior of a courthouse. Plaintiff has not met this burden because she has pointed to no clear precedent that prohibited the officers from detaining her under these circumstances.

Instead, Plaintiff argues that it was clearly established in March 2018 that officers could not detain or arrest a person for exercising her First Amendment rights

in filming on a public sidewalk outside of a courthouse. [121] at 13–14. To be sure, no one questions that the "act of *making* an audio or audiovisual recording" is included within the First Amendment's guarantee of speech and press rights "as a corollary of the right to disseminate the resulting recording." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012). But this defines the clearly established right at a "high level of generality" without considering the "specific context of the case"— something the Supreme Court has repeatedly cautioned courts to refrain from. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *see also Leiser v. Kloth*, 933 F.3d 696, 702 (7th Cir. 2019) ("In deciding a question of qualified immunity, the level of specificity at which the legal question is asked is often decisive, and it is possible to be too general and too specific."), *cert. denied*, 140 S. Ct. 2722, (2020).

Here, the relevant constitutional right is not whether a person can film the exterior of a government building, but rather whether Plaintiff had the right to be free from an investigatory detention when a courthouse officer believed she was filming inside the courthouse (and when she, in fact, did film inside the courthouse), and also whether Plaintiff had the right to be free from arrest when she continued to film and remained evasive and uncooperative when officers asked her for her identity and the purpose of her recording. In the absence of any clearly established precedent forbidding the officers from taking action under these circumstances, Defendants remain entitled to qualified immunity on Plaintiff's Fourth Amendment claims. *See Taylor v. Ways*, 999 F.3d 478, 491 (7th Cir. 2021) (noting that a plaintiff overcoming a qualified immunity defense must show that the *wrongfulness of the defendant's*

22

*conduct* was clearly established). For this reason, and because Plaintiff fails to raise a genuine issue of material fact as to the violation of her Fourth Amendment rights, this Court grants summary judgment to Defendants on Plaintiff's Fourth Amendment seizure claims.

### 5. Searches of Plaintiff's Belongings

This Court separately analyzes Plaintiff's claims based upon the constitutionality of the officers' searches of her purse and the contents of her camera. The undisputed record shows that, at some point while the officers held Plaintiff inside the courthouse, Milazzo emptied the contents of Plaintiff's purse on a counter and searched her wallet until he found her identification. [108] at ¶ 27. Milazzo also searched through the contents of Plaintiff's camera. *Id.* at ¶ 28. Plaintiff challenges the constitutionality of these searches.

Warrantless searches are "per se unreasonable under the Fourth Amendment unless they fall within 'a few specifically established and well-delineated exceptions.'" *United States v. Charles*, 801 F.3d 855, 860 (7th Cir. 2015) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). One such exception allows officers during a *Terry* stop "to frisk a detained person for weapons if the officers have an articulable suspicion that the person is both armed and a danger to the safety of officers or others." *United States v. Leo*, 792 F.3d 742, 748 (7th Cir. 2015). Another exception to the warrant requirement is a search performed "incident to a lawful arrest." *United States v. Jenkins*, 850 F.3d 912, 917 (7th Cir. 2017). The justification for this exception is the protection of the arresting officer and the preservation of evidence." *Id.* A search

incident to an arrest is constitutionally valid if "it does not extend beyond 'the arrestee's person and the area within his immediate control.'" *United States v. Hill*, 818 F.3d 289, 295 (7th Cir. 2016) (quoting *Gant*, 556 U.S. at 339). The "zone of immediate control" includes the area from which the suspect might gain possession of a weapon or destructible evidence, *id.*, such as containers found on the suspect, *Leo*, 792 F.3d at 748.

Applying these standards, the seizures and searches of Plaintiff's purse and wallet plainly fall within the scope of the search incident to arrest exception because Plaintiff exercised "immediate control" over her purse. *Hill*, 818 F.3d at 295 (holding that officers conducted a permissible search incident to an arrest of a bag the defendant was holding); *United States v. Rutley*, 482 F. App'x 175, 177 (7th Cir. 2012) ("The search of Rutley's bag was valid as a search incident to arrest, because the Fourth Amendment permits officers to search, without a warrant, any container carried by an arrestee, including bags, purses, wallets, and books."). Plaintiff's Fourth Amendment claim based on the search of her purse and wallet, accordingly, fails.

Likewise, Plaintiff fails in her challenge to Milazzo's search of the contents of the camera. Plaintiff cites to *Riley v. California*, 573 U.S. 373 (2014), where the Supreme Court held that "the warrantless search of a cell phone is not a permissible search incident to arrest," *United States v. Gary*, 790 F.3d 704, 705 (7th Cir. 2015); *see also United States v. Berrios*, 990 F.3d 528, 531–32 (7th Cir. 2021). In *Riley*, the Court reasoned that modern cell phones have "immense storage capacity" and collect

"many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record" and thus trigger privacy concerns. 573 U.S. at 393, 394. In other words, cell phones contain a "digital record of nearly every aspect" of a person's life. *Id.* at 395. Relying upon *Riley*, Plaintiff argues that a video camera is sufficiently analogous to the cell phones that the Supreme Court categorically held required warrants to search. [107] at 22–23. But, as a California district court explained, *Riley* limited its holding to cell phones and left "the law with regard to cameras unsettled." *Am. News & Info. Servs., Inc. v. Gore*, No. 12-CV-2186 BEN KSC, 2014 WL 4681936, at *10 (S.D. Cal. Sept. 18, 2014). Phones "are both similar to and different from cameras"; like cell phones, cameras typically lack the potential to be used as a weapon, have significant storage capacity, and potentially can reconstruct an individuals' private life through date-stamped photographs. *Id.* Unlike cell phones, however, cameras do not contain phone call logs, text messages, applications, hobbies, budgets, or a "'digital record of nearly every aspect' an individual's life." *Id.* (quoting *Riley*, 573 U.S. at 395); *see also, e.g.*, *United States v. Miller*, 34 F. Supp. 3d 695, 699 (E.D. Mich. 2014) ("Dedicated cameras, unlike cell phones, are unlikely to be used on a continuing, daily basis, and therefore do not boast the extensive amount of personal information commonly present in cell phones.").

In this case, this Court need not conclusively determine whether the Court's holding in *Riley* applies to cameras because Defendants are entitled to qualified immunity on the warrantless search of Plaintiff's camera. To overcome Defendants'

assertion of a qualified immunity defense, Plaintiff must demonstrate that "existing precedent" clearly established that the warrantless search of a camera incident to an arrest was unconstitutional as of March 2018. *Allin*, 845 F.3d at 862. Because *Riley* left the law with regard to cameras unsettled, Plaintiff cannot demonstrate that the law clearly established the unconstitutionality of the search of a camera incident to an arrest. Thus, Defendants are entitled to qualified immunity related to the search of Plaintiff's camera. *See, e.g.*, *Am. News & Info. Servs*, 2014 WL 4681936, at *10 (dismissing claims based upon an unlawful search of a camera incident to arrest on qualified immunity grounds because it could not find that "existing precedent . . . placed the statutory or constitutional question beyond debate") (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

## B. First Amendment Retaliation Claims

In Counts I and II, Plaintiff alleges that Defendants arrested her in retaliation for her protected First Amendment activity of filming. [34] ¶¶ 93–111. The parties now cross-move for summary judgment on these claims; Plaintiff argues that the undisputed facts establish that Defendants retaliated against her for engaging in First Amendment conduct, [107] at 14–17, while Defendants argue that qualified immunity entitles them to summary judgment, [113] at 17–19.

To prevail on her First Amendment retaliation claims, Plaintiff must prove three elements: (1) she engaged in activity protected by the First Amendment; (2) she suffered an adverse action that would likely deter future First Amendment activity; and (3) the First Amendment activity was "at least a motivating factor" in the

Defendants' decision to retaliate. *Lavite v. Dunstan*, 932 F.3d 1020, 1031 (7th Cir. 2019); *Santana v. Cook Cty. Bd. of Review*, 679 F.3d 614, 622 (7th Cir. 2012). Importantly, in *Nieves v. Bartlett,* 139 S. Ct. 1715, 1724 (2019), the Supreme Court held that in "most cases, probable cause to arrest defeats a claim of retaliatory arrest." *Lund v. City of Rockford*, 956 F.3d 938, 941 (7th Cir. 2020).

*Nieves* forecloses Plaintiff's retaliatory arrest claims because it categorically bars retaliatory arrest claims where, as here, probable cause supports the warrantless arrest: "No further analysis of causation, motive, or injury is required." *Lund*, 956 F.3d at 944.[3] This Court therefore grants Defendants' motion for summary judgment as to Plaintiff's First Amendment retaliation claims and denies Plaintiff's motion for summary judgment as to these claims.

### C. *Monell* Claims

To prevail on her *Monell* claims (Counts IX and X), Plaintiff must prove three elements: (1) an action pursuant to a municipal policy; (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations; and (3) that the municipal action caused her constitutional injury. *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1509 (2021). A plaintiff can establish a municipal action (the first element) under three theories: (1) an express policy adopted and promulgated by a

---

[3] *Nieves* recognizes a very limited exception to this categorical bar on retaliatory arrest claims, in cases where "officers have probable cause to make arrests, but typically exercise their discretion not to do so." 139 S. Ct. at 1727. Plaintiff has not, however, adduced any "objective evidence" that she "was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* She therefore fails to demonstrate the applicability of this limited exception to the no-probable-cause requirement.

27

municipality's officers; (2) an informal but widespread practice or custom; or (3) an action by a policymaker authorized to act for the municipality. *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1125 (2021).

In this case, Plaintiff advances several theories of *Monell* liability. First, she posits that the Cook County Sheriff's Office maintains an unconstitutional policy of detaining people for exercising their First Amendment rights to take pictures. [107] at 10–11. Relatedly, Plaintiff theorizes that the Sheriff's Office maintains a policy of inadequately training officers on the requirements for reasonable suspicion. *Id.* at 8–9; [121] at 16. These theories fail at the outset because a *Monell* claim requires a predicate constitutional violation, *Hall v. City of Chicago*, 953 F.3d 945, 955 (7th Cir. 2020); *Horton v. Pobjecky*, 883 F.3d 941, 954 (7th Cir. 2018), and this Court has already determined that Plaintiff fails to raise a triable issue on her claims for First Amendment retaliation and Fourth Amendment seizure.

This Court also rejects Plaintiff's attempt to base a *Monell* claim upon "Cook County Court Services Policy 172" against the Cook County Sheriff's Office. *See* [107] at 12–13; [107-10].[4] This "Policy 172" provides "guidelines for reporting and investigating suspicious and criminal activity"; defines "suspicious activity" as including "pre-operational surveillance or intelligence gathering (e.g., photographing security features, asking questions about sensitive security-related subjects)"; and directs any "member receiving information regarding suspicious activity [to] take any

---

[4] Although Plaintiff assumes that Cook County promulgated these guidelines, Defendant Cook County Sheriff's Office admits that it is the entity that maintains responsibility for those guidelines. [128] at 8.

necessary immediate and appropriate action." [107-10] at 2, 3. Citing Policy 172, Plaintiff argues that the Cook County Sheriff's Office provides a detainment standard based upon less than reasonable suspicion in contravention of *Terry* and the Fourth Amendment. [107] at 12. Like Plaintiff's first two *Monell* theories, this theory also fails due to Plaintiff's failure to raise a triable issue of fact as to the reasonableness of her Fourth Amendment seizure. *Hall*, 953 F.3d at 955; *see also, e.g.*, *Blackmon v. City of Chicago*, No. 19 C 767, 2020 WL 1888913, at *5 (N.D. Ill. Apr. 16, 2020) (finding that "the question of whether the Defendant Officers committed a constitutional violation is dispositive and [the plaintiff's] claims can be resolved without delving into the *Monell* claims"). Moreover, Policy 172 was issued and became effective on June 1, 2018, about two months after Plaintiff's encounter with the officers at the Bridgeview Courthouse. [107-10] at 2. Thus, Plaintiff could not prove that the policy constituted the "moving force" behind her alleged constitutional violations. *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021).

Plaintiff also attempts to hold Cook County liable under *Monell*, arguing that the County maintains an unconstitutional policy—the general administrative order barring recording inside the courthouse—that permits officers to stretch the terms to excess, detaining people for filming outside the courthouse. [107] at 10–12. This theory also fails because Plaintiff has no viable claim against the County. This Court has already dismissed Cook County from this lawsuit from all substantive claims, *see Bergquist v. Milazzo*, No. 18-CV-3619, 2020 WL 757902, at *5 (N.D. Ill. Feb. 14, 2020),

and Plaintiff has not since requested leave to reassert any claims against Cook County.

## IV.    Conclusion

For the reasons explained above, this Court grants Defendants' motion for summary judgment [112], denies Plaintiff's motion for summary judgment [107], and directs the Clerk to enter judgment in Defendants' favor on all remaining counts. All dates and deadlines are stricken. Civil case terminated.

Dated: September 28, 2021

Entered:

John Robert Blakey
United States District Judge

30